UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| YOLANDE MARIE WELCH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:14-01802 |
| | ) | Judge Nixon/Brown |
| CAROLYN W. COLVIN, | ) | |
| ACTING COMMISSIONER | ) | |
| OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

**To: The Honorable John T. Nixon, Senior United States District Judge.**

## REPORT AND RECOMMENDATION

This action was brought under 42 U.S.C. §§ 405(g) and 1383(c) for judicial review of the final decision of the Social Security Administration through its Commissioner, denying plaintiff's applications for Disability Insurance Benefits (DIB) under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 416(i) and 423(d), and Supplemental Security Income (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381, *et seq*. For the reasons explained below, the undersigned **RECOMMENDS** that plaintiff's motion for judgment on the administrative record (Doc. 14) be **DENIED** and the Commissioner's decision **AFFIRMED**.

## I. PROCEDURAL HISTORY

Plaintiff filed for DIB on January 3, 2011, and protectively for SSI on October 27, 2010. (Doc. 10, pp. 108-24, 141)[1] Plaintiff alleged an initial disability onset date of September 12, 2009 in both instances, subsequently amending that date to December 10, 2010. (Doc. 10, pp. 27, 108, 141) Plaintiff claimed she was unable to work because of degenerative disc disease, a crushed and

---

[1] References to page numbers in the Administrative Record (Doc. 10) are to the page numbers that appear in bold in the lower right corner of each page.

shattered elbow, and a left hand condition. (Doc. 10, pp. 52, 57-58, 63, 134) Plaintiff's applications were denied initially on May 16, 2011, and upon reconsideration on November 4, 2011. (Doc. 10, pp. 48-57, 63-67) On January 3, 2012, plaintiff requested a hearing before an administrative law judge (ALJ). (Doc. 10, pp. 68-69) A hearing was held in Nashville on March 20, 2013 before ALJ David Ettinger. (Doc. 10, pp. 24-47) Vocational Expert (VE) Lisa Courtney testified at the hearing. (Doc. 10, pp. 24, 40-46, 96-97) Plaintiff was represented at the hearing by appointed counsel, Robert Parker. (Doc. 10, pp. 24, 26)

The ALJ entered an unfavorable decision on April 30, 2013. (Doc. 10, pp. 7-23) Plaintiff filed a request with the Appeals Council on May 24, 2013 to review the ALJ's decision. (Doc. 10, p. 6) The Appeals Council denied plaintiff's request on July 3, 2014, whereupon the ALJ's decision became the final decision of the Commissioner. (Doc. 10, pp. 1-5)

Plaintiff brought this action through counsel on September 4, 2014. (Doc. 1) Plaintiff filed a motion for judgment on the administrative record on January 9, 2015 (Doc. 14), the Commissioner responded on March 9, 2015 (Doc. 17), and plaintiff replied on March 18, 2015 (Doc. 18). This matter is now properly before the court.

## II. REVIEW OF THE RECORD[2]

### A. Medical Evidence

Plaintiff presented to the emergency room (ER) at the StoneCrest Medical Center (StoneCrest) in Smyrna on the morning of December 10, 2010 after falling the night before and injuring her left shoulder, upper arm, and hand. (Doc. 10, pp. 204-24) Plaintiff was diagnosed with

---

[2] The excerpts of the medical record and hearing transcript addressed below are those necessary to support the court's analysis of plaintiff's claims of error. The remainder of the medical record and transcript of the hearing are incorporated herein by reference.

2

a left displaced supracondylar[3] humerus[4] fracture, and Dr. William Mayfield, M.D., Premier Orthopaedics & Sports Medicine , performed surgery that same day. (Doc. 10, pp. 214-16) Plaintiff was discharged to home on December 12, 2010. (Doc. 10, pp. 205-06)

Plaintiff saw Dr. Mayfield post-operatively on December 17 and 21, 2010, and January 11, February 8, and March 8, 2011. (Doc. 10, pp. 235-39) On December 17, 2010, one week after surgery, Dr. Mayfield noted that, although plaintiff had "significant swelling around her [left] hand and pain around the [left] wrist and elbow," she reported that she was "doing fairly well." (Doc. 10, p. 239) Doctor Mayfield noted on examination that, although "[t]here [wa]s tenderness around the [left] wrist . . . there [wa]s no specific point of maximum tenderness." Doctor Mayfield also noted that "[s]ensibility and motor function [we]re normal distally.[5] Capillary refill [wa]s intact throughout." X-rays of her left wrist revealed "no bony abnormality," and X-rays of her left elbow revealed "no real change in her alignment . . . lateral humeral condyle remain[ed] significantly fragmented, as it was intraoperatively."

On December 21, 2010, two weeks after surgery, Dr. Mayfield noted that, although plaintiff "continue[d] to have pain and hand swelling," she again reported doing "fairly well." (Doc. 10, p. 238) Doctor Mayfield noted on examination that plaintiff's "hand continue[d] to exhibit edema,[6] although this [wa]s improving since her last visit." Doctor Mayfield also noted that her "[w]rist

---

[3] Supracondylar – "superior [above or over] to a condyle [the rounded projection on a bone, usually for articulation with another] or condyles." *Dorland's Illustrated Dictionary* 402, 1805 (32nd ed. 2012).

[4] Humerus – "the bone that extends from the shoulder to the elbow articulating proximally [nearest] with the scapula [shoulder blade] and distally [further from a point of reference] with the radius of the ulna [the inner and larger bone of the forearm]. . . ." *Dorland's* at 555, 873, 1673, 1998.

[5] Distal – "remote; farther from any point of reference . . . ." *Dorland's* at 555.

[6] Edema – "the presence of abnormally large amounts of fluid in the intercellular tissue spaces . . . ." *Dorland's* at 593.

3

motion [wa]s fairly good," and that "[t]here [wa]s no instability around the wrist." Doctor Mayfield "recommended a Doppler ultrasound of her arm" because of the swelling.

Plaintiff saw Dr. Mayfield next on January 11, 2011. (Doc. 10, p. 237) Doctor Mayfield noted that plaintiff did not have the ultrasound because "she was unable to afford it and she felt that her swelling was decreasing." Doctor Mayfield noted on examination that plaintiff "continue[d] to have an area at the dorsum[7] of her forearm which remains significantly swollen" – without fluctuance[8], erythema[9] or edema – but that "her wrist and fingers [we]re both improving nicely at this point." X-rays of plaintiff's elbow "reveal[ed] good maintenance of her alignment." He noted that plaintiff's left distal humerus fracture was "doing well," but with a "[p]ossible proximal[10] forearm hematoma."[11] Doctor Mayfield added that he "anticipate[d] continuing, slow progress . . . ."

Plaintiff returned for her next follow-up on February 8, 2011, eight weeks after her surgery. (Doc. 10, p. 235) Plaintiff reported that she was "doing fairly well," her swelling had decreased, but she had "begun to develop more stiffness . . . ." On examination, plaintiff's range of motion (ROM)

---

[7] Dorsum – "the aspect of an anatomical part or structure corresponding in position to the back; posterior . . . ." *Dorland's* at 563.

[8] Fluctuance – "showing varying levels . . . ." *Dorland's* at 719.

[9] Erythema – "redness of the skin produced by congestion of the capillaries." *Dorland's* at 643.

[10] Proximal – "nearest; closer to any point of reference: opposed to *dista*l." *Dorland's* at 1539.

[11] Hematoma – "a localized collection of blood, usually clotted, in an organ, space, or tissue . . . ." *Dorland's* at 832.

4

was "135 degrees to 90 degrees, with a very firm endpoint in flexion. Pronation[12] and supination[13] [we]re normal . . . [s]welling [wa]s decreasing." X-rays of "her elbow . . . reveal[ed] maintenance of her hardware and fracture alignment." Doctor Mayfield noted that "stiffness ha[d] become her major problem . . .[and] . . . recommended physical therapy and dynamic splinting to assist her [to] regain[] [t]his motion."

Doctor Bruce Davis, M.D., examined plaintiff consultively on March 22, 2011. (Doc. 10, pp. 225-27) On examination, Dr. Davis noted reduced neck, left shoulder, elbow and wrist ROM, "puffy left fingers with slow motions, reduced grip 3-4/5." (Doc. 10, p. 225) X-rays ordered by Dr. Davis of plaintiff's left shoulder revealed "no fracture or dislocation . . . [n]o significant arthritic change . . . evident and no tendon or other soft tissue calcification . . . evident. . . ." (Doc. 10, p. 226) The radiologist's impression was "[n]ormal appearance to the left shoulder." X-rays of plaintiff's left hand revealed the following: "No fracture dislocation is evident. There does appear to be patchy, particularly periarticular[14] osteopenia[15] in the phalanges[16] and carpus.[17] [M]ild gull wing type erosions . . . evident at the proximal interphalangeal[18] joints. Mild joint space loss is evident." (Doc. 10, p. 227) The radiologist's impression was that the images "rais[ed] question[s]

---

[12] Pronation – "the act of turning the palm posteriorly (or inferiorly when the forearm is flexed), performed by medial [pertaining to the middle] rotation of the forearm." *Dorland's* at 1118, 1526.

[13] Supination – "the act of turning the palm forward . . . or upward, performed by lateral rotation of the forearm." *Dorland's* at 1804.

[14] Periarticular – "around a joint." *Dorland's* at 1411.

[15] Osteopenia – "any decrease in bone mass below the normal." *Dorland's* at 1347.

[16] Phalanges – "any of the bones of the fingers or toes . . . ." *Dorland's* at 1424.

[17] Carpus – "wrist." *Dorland's* at 298.

[18] Interphalangeal – "situated between two contiguous phalanges." *Dorland*'s at 950.

of rheumatoid disease. Minimal osteoarthritic change is noted."

On March 8, 2011, plaintiff returned to see Dr. Mayfield. (Doc. 10, p. 236) She "[r]eport[ed] doing the same . . . [and] . . . [ha]s not really been working on motion exercises on her own at this point." On examination, Dr. Mayfield noted that plaintiff's "[f]inger motion remain[ed] decreased," she continued to have "some swelling around her hand," her "[e]lbow motion remain[ed] significantly decreased," and she was having "significant stiffness around the shoulder in all planes of motion." X-rays revealed "no real change in her alignment," but there was a "slight gap between the lateral plate in the lateral humeral condyle, likely because of bony resorption,"[19] but "overall the alignment remain[ed] fairly good." Doctor Mayfield discussed treatment options with plaintiff "at some length," and recommended that she continue to "pursue her dynamic splinting" and "stretching exercises for her hand and her shoulder." Doctor Mayfield concluded by noting: "We will plan to see her back in about 3 months, or sooner if needed."

Doctor John Mather, M.D., competed a physical residual functional capacity (RFC) assessment on May 12, 2011. (Doc. 10, pp. 244-52) Doctor Mather assessed plaintiff with the following exertional limitations: 1) able to lift 20 lbs. occasionally and 10 lbs. frequently; 2) capable of standing/walking about 6 hrs. in an 8-hr. workday; 3) can sit about 6 hrs. in an 8-hr. workday; 4) limited in her ability to occasional pushing/pulling with the left upper extremity. (Doc. 10, p. 245) Plaintiff's ability to reach in all directions and to feel was assessed as unlimited, whereas she was limited to occasional handling and fingering with the left upper extremity. (Doc. 10, p. 247) Doctor Mather included the following summary in his assessment:

> . . . . Claimant's left elbow fracture should continue to heal. However, claimant does have indication of possible early rheumatoid arthritis in her left hand by Xray.

---

[19] Resorption – "the loss of substance through physiologic or pathologic means . . . ." *Dorland's* at 1628.

> Claimant's physical condition should continue to improve. By 11/30/11 her residual functioning should improve to 20/10/6/6 with occasional push/pull left upper extremity and frequent handling and fingering for left hand.

(Doc. 10, p. 251)

Doctor Davis examined plaintiff consultively again on October 27, 2011. (Doc. 10, pp. 260-62) On examination, plaintiff again exhibited decreased neck, left shoulder and elbow ROM, and reduced bilateral grip strength. (Doc. 10, p. 261) Doctor Davis' diagnoses included Grade 1 obesity and musculoskeletal disease, *i.e.*, "neck & back injury, elbow injury/surgery, hip pain." (Doc. 10, p. 262) Doctor Davis assessed plaintiff as able to: 1) lift/carry 10-20 lbs. occasionally, 10 lbs. frequently; 2) sit 1-2 hrs. at one time, 6 hrs. in an 8-hr. workday; 3) stand/walk 1 hr. at a time, 4 hrs. in an 8-hr. workday; 4) perform limited repetitive/sustained neck motions, climbing, squatting, left overhead reaching, and tasks requiring a forceful grip.

Doctor Reeta Misra, M.D., completed a second physical RFC assessment on November 1, 2011. (Doc. 10, pp. 264-72) Exertional limitations were the same in Dr. Misra's assessment as those in Dr. Mather's. (Doc. 10, p. 265) Doctor Misra's manipulative restrictions differed from Dr. Mather's in that Dr. Misra assessed plaintiff as being able to reach in all directions, handle, and finger only occasionally, while retaining no feeling limitations. (Doc. 10, p. 267)

Plaintiff presented to the StoneCrest ER on December 2, 2011 for an abscess of the right groin. (Doc. 10, p. 274) Examination of plaintiff's extremities were normal, including normal ROM, and no tenderness. (Doc. 10, p. 275)

Plaintiff returned to see Dr. Mayfield on August 22, 2012, one year and five-plus months after she saw him on March 8, 2011. (Doc. 10, p. 276) There are no clinical notes pertaining to this visit. However, Dr. Mayfield did complete a "Work Status Report" assessing the following "[p]ermanent restrictions" applicable to plaintiff's left upper extremities: 1) no "work in an

outstretched or overhead position"; 2) "limit work involving affected extremity involving continuous grasping, twisting, etc."; 3) "limit repetitive activities"; 4) "limit push/pull activities"; 5) "[a]void lifting more than 10 pounds."

The medical record includes a report dated February 11, 2013 attributed to the "Airport Wellness Center" (the Wellness Center). (Doc. 10, pp. 277-79) The Wellness Center report reflects "severe" chronic back pain, but it cannot be determined who completed the form, or under what circumstances.

## B. Hearing

Plaintiff testified that her dominant hand is her right hand. (Doc. 10, p. 28) She then testified at length about her left arm, elbow, hand, fingers and the related limitations she allegedly experienced because of her December 2010 injury. (Doc. 10, pp. 28-33, 39-40) Plaintiff admitted that she last saw Dr. Mayfield in "May of 2011." (Doc. 10, p. 39)

The ALJ asked the VE questions pertaining to three hypothetical individuals of the same age, education, and work experience as plaintiff, but with variations on plaintiff's alleged limitations. At the conclusion of the VE's testimony on these hypothetical individuals, the ALJ asked the VE: "Have there been any inconsistencies between your testimony and the description of the jobs you've mentioned in the Dictionary of Occupational Titles?" The VE answered the ALJ's question as follows: "I don't know that the DOT really goes into limitations on one arm, specifically, in like – so there might be a little discrepancy there. Some of my experience – since I have 23 years experience placing people in the job market." (Doc. 10, p. 44)

Counsel posed two hypothetical questions to the VE at the conclusion of the ALJ's questions – "just for clarification" – to explain the effect of limitations on plaintiff's ability to "push, pull, reach, handle . . . and finger with the left upper extremity" at both the light and sedentary levels.

8

(Doc. 10, pp. 44-46) The VE explained how she arrived at the answers she provided at the hearing in the context single arm/hand use, and the extent to which those limitations eroded the employment base.

### C. The ALJ's Notice of Decision

Under the Act, a claimant is entitled to disability benefits if she can show her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505, 416.905. Corresponding regulations outline the five-step sequential process to determine whether an individual is "disabled" within the meaning of the Act. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 374-75 (6th Cir. 2014). While the claimant bears the burden of proof at steps one through four, the burden shifts to the Commissioner at step five to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (RFC) and vocational profile. *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011).

### III. ANALYSIS

### A. Standard of Review

The district court's review of the Commissioner's final decision is limited to determining whether the Commissioner's decision is supported by substantial evidence in the record, and whether the decision was made pursuant to proper legal standards. 42 U.S.C. § 405(g); *Gayheart*, 710 F.3d at 374. Substantial evidence is less than a preponderance but more than a scintilla; it refers to relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see Gentry v. Comm's or Soc. Sec'y*, 741 F.3d 708,

722 (6th Cir. 2003). The Commissioner's decision must stand if substantial evidence supports the conclusion reached, even if the evidence also could support a different conclusion. *Gayheart*, 710 F.3d at 374. "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g); *see McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006).

**B. Claims of Error**

**1. Whether the ALJ Erred in Not Giving Controlling Weight to
Dr. Mayfield's Opinion as Provided Under SSR 96-2p
(Doc. 14-1, pp. 6-8 of 14)**

Plaintiff asserts that Dr. Mayfield was her treating physician, and that the ALJ erred in not giving his opinion controlling weight as required by SSR 96-2p.

SSR 96-2p defines a treating source in terms of 20 C.F.R. §§ 404.1502 and 416.902. SSR 96-p, *Explanation of Terms*, *Controlling Weight*, 1996 WL 374188 * 2 (July 2, 1996). Sections 404.1502 and 416.902 define treating source as follows:

> Treating source means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s). We may consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s). . . .

20 C.F.R. §§ 404.1502 & 416.902.

Under the standard commonly called the "treating physician rule," the ALJ is required to give a treating source's opinion "controlling weight" if two conditions are met: the opinion "is

well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and the opinion "is not inconsistent with the other substantial evidence in [the] case record." *Gayheart*, 710 F.3d at 376 (quoting 20 C.F.R. § 404.1527(c)(2)). As established above, a treating physician is a physician who "has provided medical treatment or evaluation and has had an ongoing treatment relationship with the claimant . . . 'with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation [that is] typical for the [treated condition(s)]." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009)(quoting 20 C.F.R. § 404/1502).

Plaintiff's characterization of Dr. Mayfield as her "treating physician" is incorrect. While it is true that Dr. Mayfield performed surgery on plaintiff in December 2010, and saw plaintiff on a post-operative basis 5 times over the next 2-plus months, plaintiff did not keep the June 2011 appointment to which Dr. Mayfield referred in his March 8, 2011 treatment notes. Indeed, plaintiff testified at the hearing, and the record supports her testimony, that she had not seen Dr. Mayfield for nearly 1 ½ years at the time he completed the "Work Status Report" on August 22, 2012. The ALJ pointed this out quite clearly in the following statements in his decision: "She initially testified that Dr. Mayfield is her treating physician . . . . When asked directly, however, she acknowledged that she had not seen Dr. Mayfield since May 2011 (More likely March 2011 per Exhibit 4F) . . . . I do not give additional weight to Dr. Mayfield's opinions because they were offered on August 22, 2012, nearly a year and a half after he last treated the plaintiff and because they were not supported by reference to any abnormal medical findings." (Doc. 10, pp. 16-17)

A physician who does not have an ongoing relationship with a patient is not a treating physician as defined under the regulations or by Sixth Circuit case law. *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875-76 (6th Cir. 2007)(even though a physician may have examined/treated a claimant, the physician is not a treating source where there is not an ongoing doctor-patient

relationship); *see also Karger v. Comm'r of Soc. Sec.*, 414 Fed.Appx. 739, 744 (6th Cir. 2011)(the treating physician rule no longer applies when claimant last saw the physician more than a year prior to physician's opinion); *Hash v. Comm'r of Soc. Sec.*, 309 Fed.Appx. 981, 985-87 (6th Cir. 2009)(upholding ALJ's decision that a physician was no longer a treating source because "[a]t the time of completion [of the questionnaire the doctor] had not seen [claimant] for over three months"); *Boucher v. Apfel*, 238 F.3d 419 (Table), 2000 WL 1769520 * 9 (6th Cir. 2000)(even though a doctor examines/treats a claimant, the doctor is not a treating source if he did not have an ongoing treatment relationship with the claimant).

Because Dr. Mayfield did not have an ongoing relationship with plaintiff, he was not a treating physician, and his August 22, 2012 "Work Status Report" was not entitled to controlling weight. This claim is without merit.

### 2. Whether the ALJ Erred in Deferring to the Opinions of Non-Treating/Non-Examining Physicians Over Dr. Mayfield
### (Doc. 14-1, pp. 8-10 of 14)

Plaintiff argues that the ALJ "used a double standard when assigning weight to the opinions of non-treating State Agency Medical Consultants over Plaintiff's treating source, Dr. Mayfield's opinion." (Doc. 14-1, p. 9 of 14) Plaintiff argues further that "the ALJ essentially ignored the opinion of Dr. Mayfield, who regularly treated the Plaintiff, performed her left elbow surgery, and prescribed her pain medications."

Plaintiff's second claim of error is grounded in her mischaracterization of Dr. Mayfield as her treating physician. As noted above in plaintiff's first claim of error, Dr. Mayfield was not a treating physician under the regulations or Sixth Circuit case law. Because Dr. Mayfield was not a treating physician, there can have been no double standard in assigning weights to the medical opinions on the grounds argued. Plaintiff's second claim of error is without merit.

## 3. Whether the ALJ Committed Reversible Error in Not Clarifying an Alleged Inconsistency in the VE's Testimony
### (Doc. 14-1, pp. 10-11 of 14)

Plaintiff's third claim of error is that the VE's testimony pertaining to her "push, pull, handle, and finger [limitations] with the left upper extremity . . . [was] . . . completely inconsistent with SSR 96-9p." Plaintiff argues that "[t]he ALJ never addressed this inconsistency" and, as such, "[t]his inconsistency casts doubt on the reliability of the remainder of the Vocational Expert's testimony in this case."

Plaintiff cites SSR 96-9p in support of her argument that the ALJ committed reversible error. Social Security Regulation 96-9p provides the following in relevant part:

> Manipulative limitations: Most unskilled sedentary jobs require good use of both hands and the fingers; i.e., bilateral manual dexterity. Fine movements of small objects require use of the fingers; e.g., to pick or pinch. Most unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions.
>
> Any significant manipulative limitation of an individual's ability to handle and work with small objects with both hands will result in a significant erosion of the unskilled sedentary occupational base. . . . **When the limitation is less significant, especially if the limitation is in the non-dominant hand, it may be useful to consult a vocational expert resource.**

(emphasis added)[20]

Social Security Ruling 00-4P instructs the ALJ to "identify and obtain a reasonable explanation for any conflicts between occupational evidence provide by VEs or VSs [vocational specialists] and information in the . . . [DOT] . . . ." SSR 00-4P, 2000 WL 189704 at *1 (Dec. 4, 2000). However, the law is well established in the Sixth Circuit that the ALJ's duty to this end is satisfied if he asks the VE whether his testimony is consistent with the DOT. *Kyle v. Comm'r of*

---

[20] Plaintiff *neglected* to include that part of SSA 96-9p in bold above in her brief.

*Soc. Sec.*, 609 F.3d 847, 858 (6th Cir. 2010); *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601 (6th Cir. 2009). The ALJ is not required to conduct an independent investigation into the VE's testimony to determine if the VE's testimony is correct. *Kyle*, 609 F.3d at 858; *Lindsley*, 560 F.3d at 606.

As noted above at p. 8, the ALJ asked the VE whether her testimony was consistent with the DOT, to which the VE clarified the extent to which it was not. In other words, the VE gave the ALJ a qualified "yes." Immediately thereafter, counsel asked the VE – "just for clarification" – the extent to which plaintiff's alleged manipulative limitations to her left arm – her non dominant arm – would affect the light and sedentary job bases. The VE answered counsel's questions in depth, and to counsel's apparent satisfaction. Given that plaintiff's alleged manipulative limitations were "less significant," *i.e.*, they involved only plaintiff's non-dominant arm, the VE's testimony in response to counsel's questions complied with SSR 96-9p to "consult a vocational expert." Because there was no "actual, obvious, indisputable conflict," the ALJ had no obligation to pursue the matter further. Plaintiff's third claim of error is without merit.

### 4. Whether the ALJ Erred in Not Including a Function-By-Function Assessment in the RFC
### (Doc. 14-1, pp. 11-12 of 14)

Plaintiff argues that the ALJ erred in not including a function-by-function assessment in the RFC analysis. Plaintiff also argues that the ALJ erred by not including "substantial limitations in the RFC finding correlating to symptoms and limitations which were well-documented in the record."

Social Security Ruling 96-8p requires the ALJ to make a function-by-function assessment of plaintiff's alleged limitations. "'Although a function-by-function analysis is desirable, SSR 96-8p does not require ALJs to produce such a detailed statement in writing,' as there is a difference 'between what an ALJ must consider and what an ALJ must discuss in a written opinion.'" *Beason*

*v. Comm'r of Soc. Sec.*, 2014 WL 4063380 * 13 (E.D. Tenn. 2014)(citing *Delgado v. Comm'r of Soc. Sec.*, 30 Fed.Appx. 542, 547 (6th Cir. 2002)). More particularly, SSR 96-8p "does not state that the ALJ must discuss each function separately in the narrative of the ALJ's decision." *Beason*, 2014 WL at *13.

A plain reading of the ALJ's decision shows that she did not compare and contrast each of plaintiff's alleged limitations in her narrative. As shown above, SSR 96-8p did not require her to. The ALJ did, however, make numerous references to having taken the entire record into consideration in reaching her decision: "[a]fter careful consideration of all the evidence" (Doc. 10, p. 11); "after careful consideration of the entire record" (Doc. 10, p. 13); "**[a]fter careful consideration of the entire record**" (Doc. 10, p. 14)(bold in the original); "based on a consideration of the entire case record" (Doc. 10, p. 14); "[a]fter careful consideration of the evidence" (Doc. 10, p. 16). Taken together, the statements above, plus the ALJ's detailed RFC analysis, complied with SSR 96-8p within the meaning of *Delgado* and *Beason*. Plaintiff's first argument in her fourth claim of error is, therefore, without merit.

Plaintiff asserts in her second argument that the ALJ erred in not including "substantial limitations in the RFC finding correlating to symptoms and limitations which were well-documented in the record. Plaintiff does not identify the alleged "substantial limitations" to which she is referring, nor does she provide any argument, reference to the record, or citation to relevant authority in support of her second argument.

The district court is not obligated on judicial review to supply factual allegations in support of claims where no facts are alleged. *See Moore v. Comm'r of Soc. Sec.*, 573 Fed.Appx. 540, 543 (6th Cir. 2014)(citing *United States v. Stewart*, 628 F.3d 246, 256 (6th Cir. 2010)("Issues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed

waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones."); *Hollon ex rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 491 (6th Cir. 2006)("[W]e decline to formulate arguments on [appellant's] behalf"); *Moore*, 573 Fed.Appx. at 543 (citing *Stewart*, 628 F.3d at 256); *Spirko v. Mitchell*, 368 F.3d 603, 612 (6th Cir. 2004)(citing *United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir. 1996)("[I]ssues . . . unaccompanied by some effort at developed argumentation, are deemed waived.")). Plaintiff's second argument in her fourth claim of error is waived.

## IV. RECOMMENDATION

For the reasons explained above, the undersigned **RECOMMENDS** that plaintiff's motion for judgment on the administrative record (Doc. 14) be **DENIED** and the Commissioner's decision **AFFIRMED**. The parties have fourteen (14) days of being served with a copy of this R&R to serve and file written objections to the findings and recommendation proposed herein. A party shall respond to the objecting party's objections to this R&R within fourteen (14) days after being served with a copy thereof. Failure to file specific objections within fourteen (14) days of receipt of this R&R may constitute a waiver of further appeal. *Thomas v. Arn*, 474 U.S. 140, 142, *reh'g denied*, 474 U.S. 111 (1986); *Alspsugh v. McConnell*, 643 F.3d 162, 166 (6th Cir. 2011).

**ENTERED** this 4th day of November, 2015.

/s/ Joe B. Brown
Joe B. Brown
United States Magistrate Judge